**UNITED STATES of America,**
**Plaintiff/Appellee,**

v.

**Pedro "Pepe" VALLE–SANCHEZ,**
**Defendant/Appellant.**

**and**

**UNITED STATES of America,**
**Plaintiff/Appellee,**

v.

**Miguel VALLE–SANCHEZ,**
**Defendant/Appellant.**

**Nos. 89–6235, 89–6236.**

United States Court of Appeals,
Tenth Circuit.

Aug. 24, 1990.

Richard Anderson, for defendant/appellant Pedro Valle–Sanchez.

Duke Holden, for defendant/appellant Miguel Valle–Sanchez.

Robert G. McCampbell, Asst. U.S. Atty. (Timothy D. Leonard, U.S. Atty., with him on the Brief) for plaintiff/appellee.

Before LOGAN and BALDOCK, Circuit Judges, and DUMBAULD *, Senior District Judge.

DUMBAULD, Senior District Judge.

The two above-captioned related appeals will be treated together, as they involve the same facts. Appellant Pedro (Pepe) Valle–Sanchez in No. 89–6235 and appellant Miguel Valle–Sanchez in No. 89–6236 appeal from sentences entered upon their pleas of guilty of conspiracy to distribute cocaine in violation of 21 U.S.C. 841.[1] They contend that the District Court[2] erroneously computed the quantities of cocaine taken into account in calculating their guideline sentences. We affirm.[3]

At the sentencing hearing, the sentencing judge heard the testimony of the F.B.I. agent, with cross-examination by lawyers for both defendants, and full argument concerning their objections to the presentence reports. In conclusion, the Court accepted the PSR on Pepe as presented. In the PSR on Miguel certain paragraphs (about guns and marijuana) were stricken upon agreement of the parties, which reduced the sentencing range from 97–121 months to 78–97 months.[4]

There is no doubt concerning three sales to undercover Agent Floyd Zimms of the F.B.I. These involved quantities of one ounce, one-quarter ounce, and one-half ounce respectively. The one ounce was the largest amount the agent ever actually purchased.[5]

---

* The Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, sitting by designation.

1. For brevity the appellants, who are brothers, will be designated as Pepe, who received a term of 63 months, and Miguel, who was sentenced to 80 months. Perhaps Miguel was more of the supervisor of the conspiracy who handled the money, and Pepe more of the custodian of the cocaine, but both collaborated in the business. Transcript of sentencing hearing (hereafter Tr.) 60, 69–70; presentence report (hereafter PSR) on Miguel, ¶ 9. Judge West counted only the quantities which the brothers had in their possession available for distribution.

2. The Honorable Lee R. West, United States District Judge of the Western District of Oklahoma.

3. The briefs and appendices in these appeals amount to 334 pages. That does not include the presentence reports, the transcript of sentencing hearing, and the F.B.I. agent's affidavit received in evidence at the hearing. This material has been read by three appellate judges, after the trial judge made his calculation with the help of a pre-sentence report by the probation officer, which was based upon the transcripts of tapes recording appellants' conversations with the undercover agent, Special Agent Floyd Zimms of the F.B.I., whose testimony at the sentencing hearing included an affidavit reviewing the tapes. The material must then be reread by the writing judge. The object of this procedure is to add up the number of grams of cocaine to be used under the sentencing guidelines promulgated pursuant to recent legislation. To the average citizen this situation may evoke the well-known ejaculation of Mr. Bumble in *Oliver Twist* by Charles Dickens. See Gilbert A. Pierce and William A. Wheeler, *The Dickens Dictionary* [London, 1878] 98.

4. Tr. 75–76.

5. Tr. 58.

On the day of the one-ounce sale, Agent Zimms saw that there was more cocaine present[6] in the cache or "storage spot", the trunk of Pepe's car.[7] Miguel had told Zimms that he had bought a pound for $10,000.[8] Zimms had found the appellants reliable in their representations from time to time of the amounts of cocaine they had on hand available for sale. They would tell him on occasions when they did not have any.[9]

Moreover (and this is very significant) the substance sold on October 18, 1988, (when Zimms bought the ounce) upon being tested had a purity of 94%. In the drug trade high purity shows the supplier is closer to the source and has access to large quantities. The quality test corroborates Miguel's statements that he had bought a pound, that the ounce sold to Zimms was "off the block" or "rock".[10]

Appellants' attack on their sentences is based upon inclusion of the "pound" in computing the quantity of drugs attributable to defendants in calculating the guidelines range of sentencing.[11]

■ Appellants' broadest argument (that their sentence should not be based upon a larger quantity of drugs than the amount specified in the indictment) is obviously untenable, being contrary to the express terms of the guidelines themselves.[12] (The guidelines would also permit inclusion of amounts which a defendant agrees to sell but is unable to or does not deliver.[13] This is what appellants' argument about "negotiations" refers to, but such a transaction is not involved in the case at bar and the whole discussion about "negotiation" is irrelevant.)

The contention that only quantities seized or tested and analyzed or actually seen or handled by government witnesses is also obviously unsound. *U.S. v. Gohagen*, 886 F.2d 1041, 1043 (8th Cir.1989).

■ Appellants' main argument is that addition of the "pound" to the calculus violates the plea agreement.

---

**6.** Tr. 72.

**7.** Tr. 69–70.

**8.** Tr. 42, 70–71.

**9.** Tr. 40.

**10.** Tr. 40–42.

**11.** The Court sentenced "at the lower end of the guideline range." Pepe received 63 months (Tr. 77) and Miguel 80 months (Tr. 79).

**12.** Guideline 1B1.3 (commentary, background) plainly states: "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range. The range of information that may be considered at sentencing is broader than the range of information upon which the applicable sentencing range is determined." Guideline 1B1.4 permits use of "any information concerning the background, character and conduct of the defendant unless otherwise prohibited by law."

**13.** Guideline 2D1.4 provides:
If a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed.
A co-conspirator's "criminal activity that was reasonably foreseeable by the defendant" may be included in establishing a defendants' offense level. Guideline 1B1.3, Application Note 1. Application Notes to 2D1.4 provide:
1. If the defendant is convicted of a conspiracy that includes transactions in controlled substances in addition to those that are the subject of substantive counts of conviction, each conspiracy transaction shall be included with those of the substantive counts of conviction to determine scale. If the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the Court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the Court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing. If the defendant is convicted of conspiracy, *see* Application Note 2 to § 1B1.3 (Relevant Conduct).
2. Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

At first there seems to be some plausibility to the contention that paragraph 4(b) of the agreement prohibits use of defendants' admissions against them "in any criminal case or criminal investigation" (including, one might at first blush suppose, the case at bar). Scrutiny of the actual terms of 4(b), however, immediately demonstrates the unsoundness of such a supposition.

Paragraph 4(b), in its entirety reads as follows:

It is further understood that no information given by this defendant subsequent to and in response to this agreement will be used against him *in any criminal case or criminal investigation,* except as described in Paragraph No. 2, and except in a prosecution for perjury, or a perjury-related offense, and except if he violates any provision of this Plea Agreement, in which event it is specifically understood and agreed that all information given by him, or derivatives thereof, shall be admissible in evidence in any proceedings against him. [Italics supplied].

It jumps to the eyes (as the fictional Belgian detective Hercule Poirot might say) that this prohibition against use of the defendants' self-incriminating statements is applicable only to statements *"subsequent to and in response to this agreement."* The statements about the "pound" were made *before* the plea agreement and were not "in response to" or in pursuance of the plea agreement.

Moreover, there is an express exception to the prohibition, contained in the words *"except as described in Paragraph No. 2."* What do those words say? Note the provisions of 2(a) and 2(c):

(a) That at the time of sentencing, the Government will make no recommendation as to the actual sentence to be imposed,[14] but may provide pertinent facts and other information to the Court concerning the offense and the defendant's involvement in it;

\*   \*   \*   \*   \*   \*

(c) The Government reserves the right to provide any facts or pertinent background information concerning this defendant to the United States Probation Office prior to sentencing;

As the sentencing judge observed, with respect to Paragraph 2 of the plea agreement: "That seems to authorize precisely what they've done here, and would not seem to be a violation [of the plea agreement]."[15] We, too, find no violations of the plea agreement.[16] And as previously noted, we find that the sentencing judge justifiably found from the evidence in the record that appellants' drug dealings went beyond the 1¾ ounces set forth in the indictment and that the "pound" they spoke of as available for purchase could properly be taken into account in computing the guideline range for sentencing purposes.

Accordingly, the judgments of the District Court are

AFFIRMED.

---

**14.** Paragraph 5 of the agreement emphasizes this point:

The parties further agree that the United States has advised this defendant that the matter of sentencing is within the discretion of the sentencing court and that the United States has made no promises or representations to this defendant or his attorney regarding what sentence might be imposed. The parties further agree that the United States has advised this defendant that sentencing will be governed by the Sentencing Reform Act of 1984.

**15.** Tr. 10–12.

**16.** The *uberrima fides* of the Government is shown by the fact that before the plea agreement the defendants were aware of the fact that their conversations with the person known to them as "Tony" had been tape-recorded and that "Tony" was in reality an F.B.I. agent. Use of additional admissions by appellants regarding other matters than the three actual sales aggregating 1¾ ounces therefore came as no surprise to defendants.